Sean F. Bigley – State Bar No. 300851
sfbigley@ajsocal.org
Gerard Murphy – State Bar No. 296821
gmurphy@ajsocal.org
Catherine Y. Hwang – State Bar No. 340136
chwang@ajsocal.org
Binwant K. Kahlon – State Bar No. 366721
bkahlon@ajsocal.org

ASIAN AMERICANS ADVANCING JUSTICE SOUTHERN CALIFORNIA
1145 Wilshire Blvd., Los Angeles CA 90017
Telephone: 213-977-7500
Facsimile: 714-477-2961

Attorneys for Petitioner
LAM HONG LE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

| | |
|---|---|
| LAM HONG LE,<br><br>Petitioner,<br>v.<br><br>JOSHUA JOHNSON, WARDEN, ADELANTO ICE PROCESSING CENTER; MARKWAYNE MULLIN, SECRETARY, DEPARTMENT OF HOMELAND SECURITY; DAVID VENTURELLA, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD BLANCHE, ATTORNEY GENERAL OF THE UNITED STATES; THOMAS P. GILES, LOS ANGELES FIELD OFFICE DIRECTOR, IMMIGRATION AND CUSTOMS ENFORCEMENT; DEPARTMENT OF HOMELAND SECURITY; EXECUTIVE OFFICE OF IMMIGRATION REVIEW; IMMIGRATION AND CUSTOMS | Civil Case No.: **5:26-cv-05151**<br><br>**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

ENFORCEMENT,

Respondents.

## INTRODUCTION

Petitioner Lam Hong Le ("Petitioner" or "Mr. Le") is a fifty-eight-year-old Vietnamese refugee who has been living in the United States for approximately forty-five years. After a traumatic childhood in Vietnam during the Vietnam War, Petitioner was forced to leave his mother behind and immigrate to the United States with only his younger brother to live with sponsors. Sadly, shortly after arriving to the U.S., Petitioner was separated from his brother and placed with the sponsors' relatives instead. Without his mother and brother with him to help adjust to a new country, Petitioner became isolated and depressed, and eventually ran away. Petitioner was without a place to call home or his family, and so he turned to the only community he could find on the streets, a gang.

Petitioner will forever regret this decision. His involvement with the gang and concurrent struggle with drug and alcohol abuse to deal with his past and ongoing trauma unfortunately resulted in Petitioner later being convicted of assault with a deadly weapon in 1986 and of murder in 1992, both involving gang-related conflicts. Petitioner was incarcerated at the San Quentin state prison from approximately 1993 until he was unexpectedly released on parole in 2019. However, he was detained almost immediately after his release and transferred to the Yuba County Detention Facility where he remained for over two months until he was released on an Order of Supervision ("OSUP"). Since his release from detention in 2019, Petitioner has focused on using his newfound freedom to reform his life, atone for his crimes, and serve vulnerable members of the community.

Unfortunately, his freedom was short-lived. On or around May 31, 2026, Petitioner was arrested by the Paso Robles police department. Not more than a week after he was arrested, Petitioner was transferred to the Adelanto ICE Processing Facility ("Adelanto") and has remained detained there since. Petitioner is unaware of the circumstances or the basis to justify his arrest and re-detention. Petitioner is unaware of any Notice of Revocation of Release ("NORR") being served that details

the basis for revoking his OSUP, of ever being informed of the basis for his arrest and re-detention, of being provided with any interview prior to, during, or immediately after his arrest and re-detention, or of being provided with any opportunity or process to contest his re-detention.

Petitioner does not challenge the underlying removal order. Petitioner challenges the ongoing unlawful detention by Respondents. Respondents' actions violate the Due Process Clause, the Immigration and Nationality Act's post-order detention framework, and ICE's own governing regulations. ICE already released Petitioner once after concluding it could not remove him within the statutory time period. The present record does not show that anything material has changed as to removability, foreseeability, danger, or flight risk. It *does* show that Petitioner has spent the last three decades reforming himself and dedicating his life to his community.

Petitioner therefore seeks a writ of habeas corpus, an order to show cause, declaratory relief, injunctive relief, and immediate release on appropriate conditions.

## JURISDICTION

Petitioner is in the physical custody of Respondents at the Adelanto ICE Processing Center in Adelanto, California, within the Central District of California. This Court has jurisdiction under 28 U.S.C. § 2241 *et seq.*, because Lam Hong Le is in custody in violation of the Constitution and laws of the United States. The district courts retain jurisdiction under 28 U.S.C. § 2241 to test the legality of executive detention, including detention incident to removal. *INS v. St. Cyr*, 533 U.S. 289, 304-05 (2001); *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001).

This Court also has subject matter jurisdiction under the habeas corpus statutes, the Suspension Clause of the Constitution, U.S. CONST. art. I, § 9, cl. 2, and 28 U.S.C. § 1331 because this action arises under federal law, including the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, the Administrative

Procedure Act, 5 U.S.C. § 551 *et seq.*, § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

This Court may grant relief pursuant to the habeas corpus statutes, 28 U.S.C. § 2241 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, and the All Writs Act, 28 U.S.C. § 1651.

Petitioner does not presently invoke the Rehabilitation Act as a standalone cause of action but reserves the right to amend should facts regarding detention-related medical or mental health deficiencies emerge.

## VENUE

Pursuant to *Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 493-500 (1973), venue lies in the United States District Court for the Central District of California, the judicial district in which Petitioner currently is detained.

Venue also properly lies in the Central District of California under 28 U.S.C. § 1391 because this is a civil action in which Respondents are agencies and officers of the United States. In addition, Petitioner was detained in this district when this Petition was filed, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## REQUIREMENTS OF 28 U.S.C. § 2243

The habeas statute requires that this Court adjudicate this case quickly. Upon receipt of the petition, the Court must either grant the petition for writ of habeas corpus or issue an order to show cause ("OSC") to Respondents "forthwith," unless the petitioner is not entitled to relief. 28 U.S.C. § 2243. If an OSC is issued, the Respondents must file a return "within three days unless for good cause additional time, not exceeding twenty days, is allowed." *Id.*

Courts have long recognized the significance of the habeas statute in protecting individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most important writ known to the constitutional law… affording as it does a *swift*

and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

Habeas corpus must remain a swift remedy. Importantly, "the statute itself directs courts to give petitions for habeas corpus special, preferential consideration to insure expeditious hearing and determination." *Yong v. INS*, 208 F.3d 1116, 1120 (9th Cir. 2000) (internal citations omitted).

## REQUIREMENTS OF GENERAL ORDER NO. 26-05

On March 18, 2026, this Court approved General Order No. 26-05, facilitating expeditious resolution for petitions for writs of habeas corpus filed by persons seeking immigration-related relief under 28 U.S.C. § 2241. General Order 26-05 establishes an accelerated briefing schedule requiring Respondents to file a notice of appearance within three calendar days and an answer within seven calendar days of the Clerk's issuance of the scheduling notice. Petitioner's reply is due three calendar days after the answer.

Pursuant to General Order 26-05 ¶ 1 and 28 U.S.C. § 636(c), Petitioner consents to the disposition of this matter by a United States Magistrate Judge. The United States has provided general consent to Magistrate Judge jurisdiction over immigration habeas cases filed in this District, subject to its reserved right to withdraw consent in a particular case. *See* Declaration of Catherine Y. Hwang ("Hwang Decl."), Ex. A.

During the pendency of this petition, General Order 26-05 ¶ 6 requires Respondents to provide at least two court days' notice to the Petitioner, Petitioner's counsel, and this Court before removing Petitioner from the Central District of California. Given Respondents' recent practice of third-country removals and removals from the District to other detention facilities, Petitioner respectfully requests that this Court enforce this requirement.

## PARTIES

Petitioner Lam Hong Le is a citizen of Vietnam with A-Number A025127359. Since his release from ICE custody in 2019, he has resided continuously in Alameda County, California. Petitioner was re-detained on or around May 31, 2026, and remains in detention at the Adelanto ICE Processing Center in Adelanto, California.

Respondent Markwayne Mullin ("Mullin") is the Secretary of the Department of Homeland Security and is sued in his official capacity. The Secretary of Homeland Security is charged with the administration and enforcement of immigration laws. 8 U.S.C. § 1103(a). Mr. Mullin also oversees ICE, which is responsible for Petitioner's detention. Mr. Mullin has ultimate custodial authority over Petitioner.

Respondent Todd Blanche ("Blanche") is the Attorney General of the United States and is sued in his official capacity as the head of the Department of Justice. The Attorney General is responsible for the Department of Justice, of which the Executive Office for Immigration Review and the immigration court system it operates is a component agency. The Attorney General is responsible for the fair administration of the laws of the United States.

Respondent David Venturella ("Venturella") is the Acting Director of ICE and is sued in his official capacity. Mr. Venturella leads ICE, which is the agency responsible for Petitioner's detention of noncitizens and the transfer or removal outside this judicial district and the United States.

Respondent Thomas P. Giles ("Giles") is the Los Angeles Field Office Director of ICE and is sued in his official capacity.

Respondent Joshua Johnson ("Johnson") is the Warden of Adelanto ICE Processing Center in Adelanto, California, has had physical custody of Petitioner since May 31, 2026, and is sued in his official capacity.

Respondent Department of Homeland Security ("DHS") is the federal agency responsible for implementing and enforcing the Immigration and Nationality Act ("INA"), including the detention, transfer, and removal of noncitizens.

Respondent Executive Office for Immigration Review ("EOIR") is the Department of Justice federal agency responsible for implementing and enforcing the INA in removal proceedings, including for custody redeterminations in bond hearings.

Respondent Immigration and Customs Enforcement ("ICE") is the DHS federal agency responsible for the detention, transfer, and removal of noncitizens.

## STATEMENT OF FACTS

### I. Petitioner's History and Life Today

Petitioner Lam Hong Le is a fifty-eight-year-old Vietnamese immigrant who has been living in the United States since he was fourteen years old. Growing up in Vietnam during the Vietnam War, Petitioner had a very difficult and traumatic childhood. Petitioner was the second oldest of seven children living with his mother. When Petitioner was approximately five years old, his father separated him from his mother and forced him to live with his father's second family. Hwang Decl., Ex. B. His father frequently beat and abused Petitioner, often in front of the second family, who themselves also bullied him. Hwang Decl., Ex. B. Petitioner recalls one vivid incident where the children of the second family grabbed human feces and tried to force it into Petitioner's face and mouth. Hwang Decl., Ex. B. After much begging and pleading with his father, Petitioner was taken back to live with his mother. Unfortunately, his father continued to abuse Petitioner. Hwang Decl., Ex. B.

Sadly, the abuse and trauma extended beyond the confines of his home. After escaping the abuse of his father's second family, Petitioner moved to a new school only to get bullied by the other children daily. Hwang Decl., Ex. B. As a child growing up amid the tumultuous Vietnam War, Petitioner witnessed incredibly traumatic moments of the conflict. Petitioner remembers seeing people getting gunned down as they tried to flee. Hwang Decl., Ex. B. He saw grenades explode and dead bodies piled on the streets. Hwang Decl., Ex. B. Soldiers of the Viet Cong invaded and pillaged the village that Petitioner lived in, and Petitioner recalls having

to step over dead bodies and to dig trenches and canals for the soldiers. Hwang Decl., Ex. B. Neighbors in Petitioner's village who were in the South Vietnamese army or were supportive of the opposition were forced to leave their homes. Hwang Decl., Ex. B. Those who stayed behind later killed themselves by ingesting rat poison or by lighting their entire families on fire. Hwang Decl., Ex. B. One memory of the tragedy of the war stands out in particular for Petitioner. One day, Petitioner was standing in the street when he saw an army ambulance drive by. Hwang Decl., Ex. B. As the ambulance turned around a corner, the back door burst open and dead bodies began to spill out of the vehicle. Hwang Decl., Ex. B. Petitioner and others on the street watched the bodies drop to the ground, but only Petitioner made any attempt to stop the ambulance. Hwang Decl., Ex. B. Petitioner chased after the driver until he noticed Petitioner and stopped. Hwang Decl., Ex. B. Petitioner told the driver about the fallen bodies, and the driver gratefully thanked Petitioner for letting him know. Hwang Decl., Ex. B. Together, they carried the bodies back into the ambulance. Petitioner was only seven years old at the time. Hwang Decl., Ex. B.

In 1979, when Petitioner was twelve years old, at his mother's urging, Petitioner and his younger brother fled Vietnam by boat and escaped to a refugee camp in Hong Kong. Hwang Decl., Ex. B. However, without their mother with them, Petitioner and his brother often suffered starvation and violence at the refugee camp. Hwang Decl., Ex. B. After approximately a year at the camp, in 1981, Petitioner and his brother were taken to the U.S. to live with sponsors. Hwang Decl., Ex. B. He became a Lawful Permanent Resident on September 24, 1982, effective February 27, 1981. Hwang Decl., Ex. C. Shortly after arriving to the U.S., Petitioner was separated from his brother and forced to live with the sponsors' relatives. Hwang Decl., Ex. B. The relatives often mistreated Petitioner and made him feel ashamed, rejected, and unwanted. Petitioner was so unhappy in the environment that he eventually ran away and lived on the streets until he found a group of people who faced similar struggles.

Later, Petitioner joined a gang, and for the first time in his life, finally felt wanted and protected.

When Petitioner joined the gang, he also began abusing drugs and alcohol to deal with his trauma. Hwang Decl., Ex. B. The gang was devoid of adult supervision or guidance and was submerged in a culture of revenge, retaliation, and violence. As a result, Petitioner found himself making many reckless decisions, one of which he will forever regret and will spend the rest of his life trying to atone. In 1986, Petitioner was convicted of assault with a deadly weapon and of murder in 1992, both involving gang-related conflicts. Petitioner was sentenced to spend a minimum of thirty-five years to life at San Quentin state prison. Hwang Decl., Ex. B, Ex. C.

Petitioner will forever regret the trauma that he inflicted on the family of the victim. He has spent the last thirty-four years dedicating his life to rehabilitation and atonement. During his time in prison, Petitioner regularly volunteered to speak with student visitors to share his story of the consequences of drugs, alcohol, and gang affiliation. Hwang Decl., Ex. B. He also enrolled and actively engaged in several treatment programs such as Alcoholic Anonymous, Narcotics Anonymous, bible studies sessions, anger management classes, and self-help classes. Hwang Decl., Ex. B.

Petitioner believed he would remain incarcerated for the rest of his life, but in 2019, Petitioner was unexpectedly granted parole and released. Unfortunately, almost immediately, he was ordered removed, detained and transferred to Yuba County Detention facility where he remained in detention for approximately sixty-eight days before he was released on OSUP. Hwang Decl., Ex. D, Ex. E. After his release from detention, Petitioner continued his volunteer service and resumed his work on reform and community service. Petitioner became a volunteer with Tsuru for Solidarity, a non-profit social justice organization seeking to end detention of asylum seekers. Hwang Decl., Ex. B. He obtained a full-time job as an essential care worker at Five Keys Housing Services in San Francisco where he cared for

unsheltered people in temporary housing. Hwang Decl., Ex. B. Petitioner even saved one of the residents at the housing from a fentanyl overdose by performing CPR on him. Hwang Decl., Ex. B. He volunteered often as a cook with the World Health Kitchen to help prepare food for low-income seniors in Oakland, Chinatown. Hwang Decl., Ex. B. When there was a surge in anti-Asian violence, Petitioner volunteered as a "street ambassador" and escorted elderly and senior Asians. Hwang Decl., Ex. B. Petitioner became a devout Christian during his incarceration and upon his release, continued to practice his faith by regularly attending a Vietnamese Christian church. Hwang Decl., Ex. B.

Petitioner has spent the last thirty-four years trying to rehabilitate, atone, and dedicate his life to serving others. The diligence and sincerity of his efforts did not go unnoticed by his community members, as evidenced by the multitude of recommendation letters submitted on his behalf in support of his application for pardon. Hwang Decl., Ex. B. These letters are from Petitioner's therapist, church leaders, employers, the Executive Director of the Oakland Chinatown Chamber of Commerce, Councilmembers of the City of Oakland, and former Assemblymember Kevin McCarty. Hwang Decl., Ex. B. However, despite Petitioner's efforts to use his newfound freedom for others, only a few short years later, Petitioner is once again in detention.

## II. <u>**Petitioner's Re-Detention**</u>

On or around May 31, 2026, Petitioner was driving in the City of Paso Robles when he was arrested by the local police. He was subsequently then transferred to the Adelanto ICE Processing Center and has remained there since. Petitioner is unaware of ever being served with any Notice of Revocation of Release (NORR) justifying his re-detention. Petitioner is unaware of being informed of the basis for his arrest and detention, of being provided with any interview prior to, during, or immediately after his arrest and detention, or being given any opportunity or process to contest the basis for his detention.

### III. <u>Petitioner's Declining Mental Health in Detention</u>

Due to a childhood and early life filled with abuse and extreme trauma, Petitioner often suffers from anxiety and depression. These conditions have become exponentially exacerbated upon his re-detention at Adelanto. Petitioner is not being provided with the care to manage his mental health, and as a result, his mental health continues to decline. So long as Petitioner remains detained and does not receive the requisite care, Petitioner's mental health condition will be such that he will be completely incapacitated. If Petitioner is released from detention, he is motivated to seek immediate treatment so that he can continue his life-long pursuit of rehabilitation and service.

### IV. <u>Removal Foreseeability, Vietnam, and Third-Country Threats</u>

Petitioner entered the United States long before July 12, 1995. As such, to justify Petitioner's re-detention and removal to Vietnam, ICE must demonstrate country-conditions evidence, bilateral agreement evidence, or repatriation data sufficient to establish that his removal is "reasonably foreseeable." *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Petitioner is unaware of any information or documentation to demonstrate that his removal to Vietnam is reasonably foreseeable.

### V. <u>Vietnam has a longstanding policy of not accepting Vietnamese immigrants who entered before 1995.</u>

ICE is unable to remove Petitioner because Vietnam has a longstanding policy of not accepting pre-1995 Vietnamese immigrants for deportation. Hwang Decl., Ex. F. In 2008, Vietnam and the United States signed a repatriation agreement under which Vietnam agreed to consider accepting certain Vietnamese immigrants for deportation. *See id.*; *See Trinh v. Homan*, 466 F. Supp. 3d 1077, 1083 (C.D. Cal. 2020). The agreement exempted pre-1995 Vietnamese immigrants, providing that "Vietnamese citizens are not subject to return to Vietnam under this Agreement if they arrived in the United States before July 12, 1995." Hwang Decl., Ex. F, at 2.

Despite this, the first Trump administration detained Vietnamese immigrants and held them for months while the administration tried to pressure Vietnam to take them. *See Trinh v. Homan*, 466 F. Supp. 3d 1077, 1083-84 (C.D. Cal. 2020). That possibility did not materialize. “In total, between 2017 and 2019, ICE requested travel documents for pre-1995 Vietnamese immigrants 251 times. Vietnam granted those requests only 18 times, in just over seven percent of cases.” *Id*. at 1087-88. The administration was forced to release many of these detainees in 2018. *See id*. at 1088.

In 2020, the United States entered a Memorandum of Understanding (“MOU”) with Vietnam that created a process through which the Vietnamese government could consider some pre-1995 Vietnamese immigrants for removal. *See* Hwang Decl., Ex. G. The MOU limited consideration to persons meeting certain criteria, but many of these criteria have been shielded from public view. *See Nguyen v. Scott*, 796 F. Supp. 3d 703, 715 (W.D. Wash. Aug. 21, 2025). When an immigrant does qualify, Vietnam has “discretion whether to issue a travel document,” which it exercises “on a case-by-case basis.” *Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at 5 (E.D. Cal. July 16, 2025).

Even after signing the MOU, Vietnam overwhelmingly declined to timely issue travel documents for pre-1995 immigrants. *Trinh,* 466 F.Supp.3d at 1087. By October 2021, ICE had adopted a “policy of generally finding that ‘pre-1995 Vietnamese immigrants’ . . . are not likely to be removed in the reasonably foreseeable future.” Order on Joint Motion for Entry of Stipulated Dismissal, *Trinh v. Homan*, 8:18-cv-316-CJC-GJS, Dkt. 161 at 3 (C.D. Cal. Oct. 7, 2021). That admission aligned with two years’ worth of quarterly reports that ICE agreed to submit as part of a class action settlement.[1] Those quarterly reports showed that

[1] *See* Asian Law Caucus, *Resources on Deportation of Vietnamese Immigrants Who Entered the U.S. Before 1995* (July 15, 2025), https://www.asianlawcaucus.org/news-resources/guides-reports/trinh-reports (providing links to all quarterly reports).

between September 2021 and September 2023, only four immigrants who came to the U.S. before 1995 were given travel documents and deported.[2]

On June 9, 2025, former Acting Director of ICE Todd Lyons rescinded ICE's policy of generally finding that pre-1995 Vietnamese immigrants were not likely to be removed in the reasonably foreseeable future. *Nguyen v. Scott*, 796 F. Supp. 3d 703, 715 (W.D. Wash. Aug. 21, 2025). But since then, several courts have found that facts on the ground likely have not changed enough to show that these detainees will be timely removed to Vietnam. *See Nguyen*, 796 F. Supp. 3d at 725; *Hoac*, 2025 WL 1993771, at 4; *Phan v. Beccerra*, No. 2-25-CV-01757-DC-JDP, 2025 WL 1993735, at 5 (E.D. Cal. July 16, 2025); *Nguyen v. Hyde*, 788 F. Supp. 3d 144, 152 (D. Mass. 2025).

## VI. **The government is carrying out deportations to third countries without providing sufficient notice and opportunity to be heard.**

When immigrants cannot be removed to their home country—including Vietnamese immigrants—ICE deports these individuals to third countries without providing adequate notice or a hearing.[3] The Trump administration reportedly has negotiated with at least fifty-eight countries to accept deportees from other nations.[4] On June 25, 2025, the New York Times reported that seven countries—Costa Rica, El Salvador, Guatemala, Kosovo, Mexico, Panama, and Rwanda— agreed to accept deportees who are not their own citizens.[5] Since then, ICE has carried out highly publicized third country deportations to South Sudan and Eswatini.[6]

The Administration has reportedly negotiated with countries to have many of these deportees imprisoned in prisons, camps, or other facilities.[7] The government

[2] *See id.*
[3] Edward Wong et al, *Inside the Global Deal-Making Behind Trump's Mass Deportations*, N.Y. TIMES (June 25, 2025), https://www.nytimes.com/2025/06/25/us/politics/trump-immigrants-deportations.html.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

paid El Salvador about $5 million to imprison more than 200 deported Venezuelans in a maximum-security prison notorious for gross human rights abuses, known as Centro de Confinamiento del Terrorismo or "CECOT".[8] Panama and Costa Rica took in hundreds of deportees from countries in Africa and Central Asia and imprisoned them in hotels, a jungle camp, and a detention center.[9] On July 4, 2025, ICE deported eight men, including one pre-1995 Vietnamese refugee, to South Sudan.[10] On July 15, 2025, ICE deported five men to the tiny African nation of Eswatini, including one man from Vietnam, where they are reportedly being held in solitary confinement.[11] Many of these countries are known for human rights abuses or instability.[12] For instance, conditions in South Sudan are so extreme that the U.S. State Department website warns Americans not to travel there, and if they do, to prepare their will, make funeral arrangements, and appoint a hostage-taker negotiator first.[13]

On June 23 and July 3, 2025, the Supreme Court issued a stay of a national class-wide preliminary injunction, which required ICE to follow statutory and constitutional requirements before removing an individual to a third country. *Dep't of Homeland Sec. v. D.V.D.,* 145 S. Ct. 2153, 2162 (2025) (mem).

On July 9, 2025, ICE rescinded previous guidance meant to give immigrants a "'meaningful opportunity' to assert claims for protection under the Convention Against Torture (CAT) before initiating removal to a third country" like the ones just described. *See* Hwang Decl., Ex. H. Under the new guidance, ICE may remove any immigrant to a third country "without the need for further procedures," as long as—

---

[8] *See id*.

[9] *Id*.; Vanessa Buschschluter, *Costa Rican Court Orders Release of Migrants Deported from U.S.*, BBC (Jun. 25, 2025), https://www.bbc.com/news/articles/cwyrn42kp7no.

[10] Wong, *supra* note 3.

[11] Gerald Imray, *3 Deported by US Held in African Prison Despite Completing Sentences, Lawyers Say*, PBS News (Sept. 2, 2025), https://www.pbs.org/newshour/nation/3-deported-by-u-s-held-in-african-prison-despite-completing-sentences-lawyers-say.

[12] *Id*.

[13] Wong, *supra* note 3.

in the view of the State Department—the United States has received "credible" "assurances" from that country that deportees will not be persecuted or tortured. *Id*. If a country fails to credibly promise not to persecute or torture releasees, ICE may still remove immigrants there with minimal notice. *See id*.

## CLAIMS FOR RELIEF

This Court should grant this petition and order Petitioner's immediate release. *Zadvydas v. Davis* holds that immigration statutes do not authorize the government to detain immigrants like Petitioner, for whom there is "no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. 678, 701 (2001). Moreover, governing regulations establish the procedures that must be followed if a noncitizen's order of supervision is revoked. ICE's own regulations require changed circumstances before re-detention, as well as proper notice and a chance to contest a re-detention decision. These regulations were not followed in this case. Due process also requires ICE to provide notice and an opportunity to be heard before any removal to a third country.

## COUNT I

### Violation of the Fifth Amendment to the U.S. Constitution

### *Procedural Due Process*

1. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

2. Respondents have deprived Petitioner of his liberty without procedural protections required by the Due Process Clause when they re-arrested and detained Petitioner in violation of the governing regulations.

3. 8 U.S.C. § 1231 governs the detention and removal of noncitizens following a final order of removal. A noncitizen who has been ordered removed but has been released "shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3); *see also id.* § 1231(a)(6).

4. Title 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13 are the regulations that govern the detention and release of removable noncitizens. These regulations also establish the procedures that must be followed if a noncitizen's order of supervision is revoked. *See* 8 C.F.R. § 241.4(l); *id.* § 241.13(i). Government agencies are required to follow their own regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *United States v. Ramos*, 623 F.3d 672, 683 (9th Cir. 2010).

5. These regulations permit an official to "return[s] [the person] to custody" because they "violate[d] any of the conditions of release." 8 C.F.R. § 241.13(i)(1); *id*. § 241.4(l)(1). Otherwise, they permit revocation of release only if the appropriate official (1) "determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future," *Id*. § 241.13(i)(2), and (2) makes that finding "on account of changed circumstances." *Id*.

6. Pursuant to 8 C.F.R. § 241.4(l) and § 241.13(i), a noncitizen released on an Order of Supervision must be provided notice of the reasons for the revocation. *See* 8 C.F.R. §§ 241.4(l)(1), 241.13(i)(3). Furthermore, the governing regulations require the reasons to be given "upon revocation." 8 C.F.R. § 241.4(l)(1); *id.* § 241.13(i)(3). An "initial informal interview" is also required upon detention. 8 C.F.R. § 241.4(l)(1); *id.* § 241.13(i)(3). The purpose of the informal interview is "to afford [the noncitizen] an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(l)(1); *id.* § 241.13(i)(3).

7. The "Due Process Clause protects an alien subject to a final order of deportation." *Zadvydas*, 533 U.S. at 693-94. 8 C.F.R. § 241.13(i) governs Respondents' ability to re-detain noncitizens who were released because their earlier removal was not possible. Under 8 C.F.R. § 241.13(i), Respondents may only revoke an order of supervision if, "on account of changed circumstances," there is now a "significant likelihood" that removal will occur in the "reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). The phrase, "significant likelihood," "requires something more than a mere possibility." *Tran v. Noem*, No. 1:25-CV-01523-TLN-

CKD, 2025 WL 3268491, at *2 (E.D. Cal. Nov. 24, 2025); *Vu v. Noem*, No. 1:25-CV-01366-KES-SKO (HC), 2025 WL 3114341, at *7 (E.D. Cal. Nov. 6, 2025) (stating same).

8. Although Petitioner has been detained less than six months, this fact does not affect this claim. Numerous courts have found that "the burden-shifting framework from *Zadvydas* does not apply where the petitioner has been issued a final order of removal, detained, and subsequently released on an OSUP." *Espada v. Doe*, No. 5:25-CV-02983-JWH-KES, 2026 WL 181539, at *5 (C.D. Cal. Jan. 20, 2026); *report and recommendation adopted*, 2026 WL 192150 (C.D. Cal. Jan. 23, 2026); *see, e.g.*, *Truong v. Mullin*, No. 2:26-cv-03546-MBK, ECF No. 12, at 11 (C.D. Cal. Apr. 15, 2026) (agreeing and listing cases); *Nguyen v. Marin*, No. 5:26-CV-01130-JFW-MAR, 2026 WL 822535, at *3 (C.D. Cal. Mar. 20, 2026) (same); *Truong v. Lyons*, No. 5:26-CV-00021-AS, 2026 WL 855150, at *6 (C.D. Cal. Mar. 20, 2026) (same); *Pham v. Marin*, No. 5:26-CV-00785-MRA-SP, 2026 WL 712946, at *4 (C.D. Cal. Mar. 11, 2026) (same); *Pham v. Noem*, No. 5:25-CV-03373-MEMF-PD, 2025 WL 3763374, at *4 (C.D. Cal. Dec. 22, 2025) (same); *Nazarian v. Noem*, No. 5:25-CV-02694-KK-DSR, 2025 WL 3236209, at *5 (C.D. Cal. Nov. 5, 2025) (same).

9. Instead, in this context, "it is [ICE's] burden to show a significant likelihood that the alien may be removed." *Yan-Ling X. v. Lyons*, 813 F.Supp.3d 1157, 1163 (E.D. Cal. 2025). "[I]mposing the burden of proof on the alien each time he is re-detained would lead to an unjust result and serious due process implications." *Id*. at 1164.

10. The phrase "on account of" means that changed circumstances are "a prerequisite to revocation." *Nguyen v. Charles*, No. 1:25-CV-01592-TLN-CSK, 2025 WL 3492117, at *3 (E.D. Cal. Dec. 4, 2025); *see also Tran v. Noem*, No. 3:25-CV-02391-BTM-BLM, 2025 WL 3005347, at *2 (S.D. Cal. Oct. 27, 2025) ("§ 241.13(i)(2) requires that this determination is made before the removable [non-citizen] has had his release revoked.") (emphasis added).

11. None of the requirements of the governing regulations were followed in this matter. Petitioner is unaware of being provided with any individualized written notice explaining why ICE revoked Petitioner's supervised release status in May 2026. Petitioner is unaware of being provided with a meaningful opportunity to respond to specific allegations before re-detainment. The entire process—from revocation to deprivation of liberty—occurred in a single encounter. Petitioner is unaware of receiving any prior notice that his OSUP would be revoked. He is unaware of being given any opportunity to be heard before the revocation took effect.

12. Petitioner is unaware of being given any explanation for his re-detention or of being provided with any meaningful, pre-revocation opportunity to respond to specific grounds for re-detention. ICE appears to have used a conclusory and non-individualized revocation process, if any process was used at all. Re-detention without individualized written notice, without a meaningful opportunity to respond, and without adherence to the governing post-order supervision regulations violates procedural due process.

13. There are no changed circumstances that justify re-detaining him. His removal has not become practicable. The same treaty has applied since 2008, and the same MOU has applied since 2020. Absent any evidence for "why obtaining a travel document is more likely this time around[,] Respondents' intent to eventually complete a travel document request for Petitioner does not constitute a changed circumstance." *Hoac,* 2025 WL 1993771, at *4.

14. The fact that some deportations of pre-1995 Vietnamese immigrants are now occurring does not meet Respondents' burden to demonstrate a significant likelihood that Petitioner will be removed in the reasonably foreseeable future. *See Nguyen v. Noem*, No. 3:25-CV-03077-RBM-BJW, 2025 WL 3265815, at *1 (S.D. Cal. Nov. 21, 2025) (finding that respondents' claim that ICE had removed 324 pre-1995 Vietnamese refugees "alone does not make Petitioner's removal reasonably foreseeable"); *Truong v. Mullin*, No. 2:26-CV-03546-MBK, ECF No. 12, at 15 (C.D.

Cal. Apr. 15, 2026) ("[T]he fact that the Government is able to remove some pre-1995 Vietnamese immigrants does not show that there is a significant likelihood of Petitioner's removal in the reasonably foreseeable future."); *Nguyen v. Scott*, 796 F.Supp.3d at 725 ("The Court agrees that these developments show there is at least some possibility that Vietnam will accept Petitioner at some point. But that is not the same as a significant likelihood that he will be accepted in the reasonably foreseeable future."); *Phan v. Beccerra*, 2025 WL 1993735, at *4 (E.D. Cal. July 16, 2025) (rejecting respondents' argument that removal is reasonably foreseeable simply "because removals to Vietnam are in fact occurring").

15. Similarly, the fact that Respondents may have requested travel documents for a pre-1995 Vietnamese immigrant does not meet Respondents' burden under § 241.13. See *Tran v. Noem*, 2025 WL 3268491, at *3 (finding respondents' statement that "ERO is actively working on obtaining a travel document for Petitioner to Vietnam" insufficient); *Truong v. Lyons*, 2026 WL 855150, at *7 (finding respondents' citation to Vietnam policy change, removal of other individuals, and fact of travel document request for petitioner insufficient); *Pham v. Marin*, 2026 WL 712946, at *4 (finding fact that removals to Vietnam were occurring and ICE sent a travel document request regarding petitioner to Vietnamese Embassy two months earlier insufficient).

16. Numerous courts have released re-detained immigrants after finding that ICE failed to comply with applicable regulations. *Truong v. Mullin*, No. 2:26-CV-03546-MBK, ECF No. 12, at 18-20 (C.D. Cal. Apr. 15, 2026) (agreeing and listing cases); *Gutnik v. Bondi*, No. 5:26-CV-00908-WLH-ACCV, 2026 WL 700546, at *2-3 (C.D. Cal. Mar. 5, 2026) (collecting cases); *Luu v. Bowen*, No. 5:25-CV-03145-MEMF-SP, 2025 WL 3552298, at *9 (C.D. Cal. Dec. 11, 2025); *Hashemi v. Noem*, 809 F.Supp.3d 1027, 1036 (C.D. Cal. 2025); *Bui v. Warden of Otay Mesa Det. Facility*, No. 25-CV-2111-JES-DEB, 2025 WL 2988356, at *5 (S.D. Cal. Oct. 23, 2025) (same); *Constantinovici v. Bondi*, 806 F.Supp.3d 1155, 1165 (S.D. Cal. Oct.

10, 2025) (same); *Phan v. Noem*, No. 3:25-CV-02422-RBM-MSB, 2025 WL 2898977, at *5 (S.D. Cal. Oct. 10, 2025) (same); *Esmail v. Noem*, No. 2:25-CV-08325-WLH, RAO, 2025 WL 3030589, at *3 (C.D. Cal. Sept. 26, 2025) (same); *Diaz v. Wofford*, No. 1:25-CV-01079 JLT-EPG, 2025 WL 2581575, at *9 (E.D. Cal. Sept. 5, 2025) (same); *Delkash v. Noem*, No. 5:25-CV-01675-HDV-AGR, 2025 WL 2683988, at *6 (C.D. Cal. Aug. 28, 2025) (same); *M.S.L. v. Bostock*, No. 6-25-CV-01204-AA, 2025 WL 2430267, at *12 (D. Or. Aug. 21, 2025) (same); *Yang v. Kaiser*, No. 2:25-CV-02205-DAD-AC (HC), 2025 WL 2791778, at *5 (E.D. Cal. Aug. 20, 2025) (same); *Phan,* 2025 WL 1993735, at *4 (same); *Ceesay v. Kurzdorfer*, 781 F.Supp.3d 137, 166 (W.D.N.Y. 2025).

17. "A growing number of courts . . . have unequivocally found that the government's failure to follow its release revocation procedures renders the re-detention unlawful and requires release." *Hashemi*, 809 F.Supp.3d at 1036.

18. Respondents' detention of Petitioner without notice and a hearing violates his right to procedural due process, constituting a violation of the Fifth Amendment. Petitioner therefore is entitled to habeas, declaratory, and injunctive relief on Count One.

## COUNT II

### Violation of the Fifth Amendment to the U.S. Constitution

### *Substantive Due Process*

19. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

20. Respondents have deprived Petitioner of his liberty without any legitimate purpose in violation of his substantive due process rights under the Fifth Amendment.

21. The Due Process Clause applies to all "person[s]," including noncitizens within the United States, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *Trump v. J. G. G.*, 604 U.S. 670, 673

(2025) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings.") (quoting and citing *Reno v. Flores*, 507 U.S. 292 (1993)).

22. Like any civil detention, immigration detention violates the Due Process Clause if it is not reasonably related to its statutory purpose. *Zadvydas*, 533 U.S. at 690 (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)); *see also Demore v. Kim,* 538 U.S. 510, 527 (2003) (stating that immigration detention must "bear[] a reasonable relation to the purpose for which the individual was committed") (citing *Zadvydas*, 533 U.S. at 690). At a bare minimum, the "Due Process Clause forbids the Government to 'depriv[e] any 'person…of…liberty…without due process of law.'" *Zadvydas*, 533 U.S. at 690.

23. In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention: (1) to mitigate the risk of flight and (2) to prevent danger to the community. *Zadvydas*, 533 U.S. at 690; *Demore*, 538 U.S. at 528.

24. Petitioner presents neither a flight risk nor a danger. While Petitioner was sentenced to thirty-five years in prison for murder in a gang-related conflict, he spent his time while incarcerated completely reforming himself such that he was granted parole in 2019. Since his incarceration and release, Petitioner has continued his pursuit of rehabilitation and reform by becoming a model community member who is respected, supported, and beloved by many members of his community. Respondents have presented no evidence upon re-detaining Petitioner that he poses either a flight risk or danger. Additionally, Petitioner is unaware of any plans by Respondents to imminently deport him and, therefore, his detention is not reasonably related to any legitimate purpose and violates the Due Process Clause.

25. ICE's own prior release decision is evidence that ICE already determined Petitioner could not be removed during the relevant post-order period and that detention was not warranted at that time. Petitioner is unaware as to whether ICE procured the necessary travel documents, whether Vietnam now agrees to accept

Petitioner, or whether ICE has identified a significantly likely removal path in the reasonably foreseeable future.

26. Petitioner has strong community ties to California where he has continuously resided, along with well-documented and consistent character testimonials from multiple community members. Those facts strongly undermine any assertion that Petitioner poses an unmanageable danger or flight risk requiring continued detention rather than supervised release. His detention serves no purpose and therefore violates the Fifth Amendment. *Zadvydas*, 533 U.S. at 690. ICE's present detention of Petitioner is not reasonably related to any legitimate removal purpose and therefore violates substantive due process.

27. At a minimum, suddenly arresting and jailing someone under the circumstances present here is paradigmatically arbitrary, and therefore a violation of even the most basic protections of the Due Process Clause. *See Zadvydas*, 533 U.S. at 690. Petitioner therefore is entitled to relief on Count II.

## COUNT III

### Violation of the Fifth Amendment to the U.S. Constitution and the Convention Against Torture

### *Removal to a Third Country*

28. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

29. Petitioner is a pre-1995 Vietnamese national whose removal to Vietnam is not reasonably foreseeable, for the reasons set forth above. The realistic removal path Respondents have signaled for persons in Petitioner's position is transfer to a third country, as reflected in the recent third-country removals and the July 9, 2025 memorandum described above. Under that policy, Respondents may effect a third-country removal with little or no advance notice and without affording Petitioner an opportunity to raise protection-based claims. Removal to a third country on those terms would violate due process and the governing regulations concerning

withholding of removal and protection under the Convention Against Torture. *See* 8 C.F.R. §§ 208.16-208.18, 1208.16-1208.18.

30. ICE's policies threaten his removal to a third country without adequate notice and an opportunity to be heard. These policies violate the Fifth Amendment, the Convention Against Torture, and federal regulations. United States law enshrines protections against dangerous and life-threatening removal decisions. By statute, the government is prohibited from removing an immigrant to any third country where they may be persecuted or tortured, a form of protection known as withholding of removal. *See* 8 U.S.C. § 1231(b)(3)(A). The government "may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." *Id.*; *see also* 8 C.F.R. §§ 208.16-208.18, 1208.16-1208.18. Withholding of removal is a mandatory protection. 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(b).

31. Similarly, Congress codified protections enshrined in the Convention Against Torture ("CAT") prohibiting the government from removing a person to a country where they would be tortured. *See* 8 U.S.C. § 1231; FARRA § 2242(a) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."); 28 C.F.R. § 200.1; 8 C.F.R. §§ 208.16-208.18, 1208.16-1208.18. CAT protection is also mandatory. 8 C.F.R. § 1208.17(a).

32. To comport with the requirements of due process, the government must provide notice of the third country removal and an opportunity to respond. Due process requires "written notice of the country being designated" and "the statutory basis for the designation, i.e., the applicable subsection of § 1231(b)(2)." *Aden v. Nielsen*, 409 F.Supp.3d 998, 1019 (W.D. Wash. 2019); *accord D.V.D. v. U.S. Dep't*

*of Homeland Sec*., No. 25-10676-BEM, 2025 WL 1453640, at *1 (D. Mass. May 21, 2025); *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999).

33. The government must also "ask the noncitizen whether he or she fears persecution or harm upon removal to the designated country and memorialize in writing the noncitizen's response. This requirement ensures DHS will obtain the necessary information from the noncitizen to comply with section 1231(b)(3) and avoids [a dispute about what the officer and noncitizen said]." *Aden*, 409 F.Supp.3d at 1019. "Failing to notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported violates both INS regulations and the constitutional right to due process." *Andriasian*, 180 F.3d at 1041.

34. If the noncitizen claims fear, measures must be taken to ensure that the noncitizen can seek asylum, withholding, and relief under CAT before an immigration judge in reopened removal proceedings. The amount and type of notice must be "sufficient" to ensure that "given [a noncitizen's] capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Aden*, 409 F.Supp.3d at 1009 (citing *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976) and *Kossov v. I.N.S.*, 132 F.3d 405, 408 (7th Cir. 1998)); *cf. D.V.D.*, 2025 WL 1453640, at *1 (requiring the government to move to reopen the noncitizen's immigration proceedings if the individual demonstrates "reasonable fear" and to provide "a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings" if the noncitizen is found to not have demonstrated "reasonable fear"); *Aden*, 409 F. Supp. 3d at 1019 (requiring notice and time for a respondent to file a motion to reopen and seek relief).

35. "[L]ast minute" notice of the country of removal will not suffice, *Andriasian*, 180 F.3d at 1041; *accord Najjar v. Lynch*, 630 F.App'x 724 (9th Cir. 2016), and for good reason: To have a meaningful opportunity to apply for fear-based

protection from removal, immigrants must have time to prepare and present relevant arguments and evidence.

36. The July 9, 2025 memo's removal policies do not adhere to these requirements. *See* Hwang Decl., Ex. H. First, under the policy, ICE need not give immigrants any notice or any opportunity to be heard before removing them to a country that (in the State Department's estimation) has provided "credible" "assurances" against persecution and torture. *See id.* at 1. By depriving immigrants of any chance to challenge the State Department's view, this policy violates "[t]he essence of due process," "the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quotation modified). Second, even when the government has obtained no credible assurances against persecution and torture, the government can still remove the person with between 6 and 24 hours' notice, depending on the circumstances. Ex. G. This Court must prohibit the government from removing Petitioner without these due process safeguards.

## **COUNT IV**

### **Violation of the Administrative Procedures Act**

37. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

38. Under the Administrative Procedures Act ("APA"), a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are arbitrary and capricious. 5 U.S.C. § 706(2)(A).

39. An action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

40. It is black-letter law that an agency must provide a "reasoned explanation" for its actions. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020). Indeed, an agency must articulate "a satisfactory explanation" for its action, "including a rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted)).

41. Respondents' revocation of Petitioner's OSUP is final agency action subject to judicial review under the APA. Respondents' re-detention of Petitioner is a claim by Respondents that Petitioner can now be "expeditiously removed," a factual and legal conclusion that requires articulated reasoning: what changed, why the prior basis for supervised release no longer applies, and why removal is now significantly likely in the reasonably foreseeable future. Under *Sec. Exch. Comm'n. v. Chenery Corp.*, 318 U.S. 80, 88 (1943), a reviewing court must evaluate the agency's action on the basis of the reasoning the agency actually provided, not post hoc rationalization. *See also Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 50. Petitioner is unaware of whether Respondents actually produced the individualized revocation documentation and process that those regulations contemplate. Agency action taken without observance of required procedure and without a reasoned, individualized explanation is arbitrary, capricious, and contrary to law under 5 U.S.C. § 706(2)(A), (D).

42. Petitioner has a right to set aside agency action that violated agency procedures, rules, or instructions as arbitrary and capricious under the *Accardi* doctrine. *See United States ex rel. Accard,* 347 U.S. at 266. Under this doctrine, agencies are bound to follow their own rules that affect the fundamental rights of individuals, even those that limit otherwise discretionary decisions. *See id.* at 266-

267*; Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required.").

43. Respondents' failure to follow their own regulations in 8 C.F.R. §§ 241.4(l), 241.13(i) was in violation of the *Accardi* doctrine and was arbitrary and capricious, constituting a violation of the APA. Moreover, there is no evidence justifying Petitioner's re-detention. An agency decision that "runs counter to the evidence before the agency" is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 42. The available evidence—Vietnam's decades-long refusal to accept pre-1995 arrivals, multiple federal court findings that removal is not significantly likely, ICE's own prior policy conceding the same, ICE's own December 2019 Release Notification acknowledging that ICE was unable to effect Petitioner's deportation or removal within the statutory period—runs directly counter to Respondents' unsupported conclusion that Petitioner "can be expeditiously removed." Thus, Respondents' revocation of Petitioner's OSUP was arbitrary and capricious and should be held unlawful and set aside.

## PRAYER FOR RELIEF

Wherefore, Petitioner prays that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Order that Petitioner shall not be transferred outside of this judicial district or removed from the United States while this petition is pending;

(3) Issue an Order to Show Cause ordering Respondents to show cause within three days why this petition should not be granted;

(4) Issue a writ of habeas corpus directing Respondents to release Petitioner from unlawful custody;

(6) In the alternative, issue a writ of habeas corpus ordering that Respondents

a. restore Petitioner to the original position that he was in before the unlawful re-detention by releasing Petitioner from custody and reinstating his OSUP with the same conditions in place at the time of his unlawful re-detention; and

b. be enjoined from re-detaining Petitioner under 8 U.S.C. § 1231(a)(6) unless and until Respondents obtain a travel document for his removal;

c. be enjoined from re-detaining Petitioner without first following all procedures set forth in 8 C.F.R. §§ 241.4, 241.13, and any other applicable statutory and regulatory procedures;

d. be enjoined from removing Petitioner to any country other than Vietnam, unless they provide the following process

1. written notice to both Petitioner and Petitioner's counsel in a language/format Petitioner can understand;

i. a meaningful opportunity, and a minimum of fifteen days, to raise a fear-based claim for CAT protection prior to removal;

ii. if Petitioner is found to have demonstrated "reasonable fear" of removal to the country, Respondents must move to reopen Petitioner's immigration proceedings;

iii. if Petitioner is not found to have demonstrated a "reasonable fear" of removal to the country, a meaningful opportunity, and a minimum of fifteen days, for the Petitioner to seek reopening of his immigration proceedings.

(7) Award Petitioner's attorney reasonable fees and costs under the Equal Access to Justice Act, as amended, 28 U.S.C. § 2412, and on any other basis justified under law; and

(8) Grant any further relief that this Court may deem fit and proper.

Dated: September 4, 2026

Respectfully Submitted,

*/s/ Catherine Y. Hwang*
Catherine Y. Hwang, Esquire
California Bar No. 340136

*/s/ Sean F. Bigley*
Sean F. Bigley, Esquire
California Bar No. 300851

*/s/ Gerard Murphy*
Gerard Murphy, Esquire
California Bar No. 296821

*/s/ Binwant K. Kahlon*
Binwant K. Kahlon, Esquire
California Bar No. 366721

Attorneys for Petitioner Lam Hong Le

ASIAN AMERICANS ADVANCING
JUSTICE SOUTHERN CALIFORNIA
1145 Wilshire Blvd., Los Angeles CA 90017
Telephone: 213-977-7500
Email: sfbigley@ajsocal.org

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I represent Petitioner, Lam Hong Le, and submit this verification on his behalf. I hereby verify that the factual statements made in the foregoing Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this September 4, 2026, in Cerritos, California.

s/ Catherine Y. Hwang
Catherine Y. Hwang